O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PARAMOUNT CONTRACTORS AND    )    CASE NO.: CV 08-5653 ABC (PLAx)
DEVELOPERS, INC., et al.,     )
                              )
              Plaintiffs,     )    ORDER RE: DEFENDANT CITY OF LOS
                              )    ANGELES'S MOTION TO DISMISS
     v.                       )    SECOND AMENDED COMPLAINT
                              )
CITY OF LOS ANGELES, a        )
California municipal          )
corporation, COMMUNITY        )
REDEVELOPMENT AGENCY OF THE   )
CITY OF LOS ANGELES,          )
                              )
              Defendants.     )
_____)

     Pending before the Court is the City of Los Angeles's (the

"City's") Motion to Dismiss Second Amended Complaint ("SAC"), filed on

February 28, 2011.  (Docket No. 72.)  Plaintiffs Paramount Contractors

and Developers, Inc., et al. (collectively "Paramount") opposed on

March 14, 2011 and the City replied on March 21, 2011.  The Court

heard oral argument on April 18, 2011.  Following argument, the Court

stayed this case while an appeal in a related case was pending.

(Docket No. 85.)  That appeal was dismissed as moot on May 25, 2011,

and the parties stipulated to a schedule for supplemental briefing and

submitted additional briefs on the impact of that ruling.  (Docket

1  Nos. 88, 89, 91, 94.)  Notwithstanding that schedule, Paramount filed
2  an unauthorized sur-reply brief on July 27, 2011, which was stricken
3  as improper.  (Docket No. 99.)  With the extensive briefing from the
4  parties, the Court found that no further oral argument was necessary
5  and vacated the August 1, 2011 hearing date.  (Docket No. 95.)  For
6  the reasons below, the Court GRANTS the City's motion in its entirety
7  and DISMISSES this case WITH PREJUDICE.

8                              **BACKGROUND**

9  **I.   Procedural Background**

10       Like many similar companies, Paramount is a "supergraphic" sign
11 company "attempting to salvage litigation to maintain [two] signs in
12 the City, even after the Ninth Circuit has twice in the last two years
13 rebuffed First Amendment challenges to the City's attempts to control
14 sign proliferation throughout the City of Los Angeles." <u>Vanguard</u>
15 <u>Outdoor, LLC v. City of Los Angeles</u>, __ F.3d __, __, 2011 WL 2175891,
16 at *1 (9th Cir. June 3, 2011) (citing <u>World Wide Rush, LLC v. City of</u>
17 <u>Los Angeles</u>, 606 F.3d 676 (9th Cir. 2010) and <u>Metro Lights, LLC v.</u>
18 <u>City of Los Angeles</u>, 551 F.3d 898 (9th Cir. 2009)).  Paramount would
19 like to erect and maintain "supergraphic" signs at two locations in
20 Los Angeles: 6464 and 6565 West Sunset Boulevard (the "Sunset
21 Properties").  It has brought two lawsuits to compel the City to allow
22 it to do so, based largely on claimed First Amendment violations.  The
23 first suit, <u>Paramount Contractors & Developers, Inc. v. City of Los</u>
24 <u>Angeles</u>, No. CV 07-159 ABC (JWJx) (C.D. Cal. filed on Jan. 1, 2007)
25 ("<u>Paramount I</u>"), was resolved by summary judgment in the City's favor
26 on June 6, 2008.  Paramount appealed that ruling on June 20, 2008.
27       The instant case was filed on August 28, 2008, alleging
28 essentially the same facts and claims as in <u>Paramount I</u>, and alleging

that, around June 23, 2008, Paramount "submitted applications to the City for the right to maintain supergraphics on the Sunset Properties," but the City "refused to accept the applications or to process them." (Docket No. 1, Compl. ¶ 11.) Paramount filed its FAC on October 26, 2010, attacking almost every aspect of the City's current and former sign regulations. In a lengthy Order, the Court granted in part and denied in part the City's motion to dismiss the FAC, and Paramount filed a Second Amended Complaint ("SAC") to address the infirmities identified by the Court.

In the meantime, the City moved to dismiss the appeal in Paramount I as moot because the original sign regulation challenged in that case had been amended in September 2010 to prohibit all supergraphic signs with limited exceptions, none of which applied to Paramount. The Ninth Circuit agreed and dismissed the appeal as moot.

In the unpublished memorandum disposition, the court explained that any claims for declaratory and injunctive relief were moot because a September 2010 amendment to the Hollywood Signage Supplemental Use District (the "Hollywood SUD") prohibited new supergraphic signs and eliminated both the sign reduction program in the Hollywood SUD and the City's delegation of authority to the Community Redevelopment Agency ("CRA") to negotiate exceptions to that program in exchange for certain fees. The court also rejected Paramount's argument that it had live claims for damages "because Paramount, for strategic reasons, disavowed damages before the district court." While Paramount had argued that the disavowal was only intended to cover "past damages" and that it could still pursue damages arising between this Court's June 2008 summary judgment and the September 2010 amendment to the Hollywood SUD, the court disagreed

in light of Paramount's admission that it "has acknowledged that it is not seeking damages in this action."  Importantly, the court reasoned that, "[i]n any event, Paramount is not able to demonstrate that any alleged damages it incurred after the district court's order resulted from application of the provisions of the Hollywood SUD challenged in the complaint."  The court also rejected the possibility that attorney's fees created a live controversy where none otherwise existed.

After this disposition, the parties briefed its impact in this case, as well as the impact of <u>Vanguard</u>, a third published decision in a similar case rejecting challenges to the City's regulations of supergraphic signs.

## II.  Allegations in the SAC[1]

In dismissing most of the FAC, the Court ruled that only the following claims remained live: (1) claims for damages directed at the Original Hollywood SUD; (2) as-applied claims that the City allowed some signs as exceptions to the Amended Hollywood SUD; (3) as-applied claims directed at the City's general Sign Ordinance; (4) equal protection claims of discriminatory treatment; and (5) takings claims. (Docket No. 67.)  In the SAC, Paramount retreads much of the same ground as in the FAC, albeit with some clearer explanation of the nature of its remaining claims.

### A.  Sign Locations

As relevant here, Paramount has provided more information for its allegations that some companies have been approved to erect

---

[1]The Court has already explained in detail the factual underpinnings of this case in dismissing the FAC and need not explain it all again here.

supergraphic and other signs in the Hollywood SUD and elsewhere, even though those signs should have been subject to the same conditions as Paramount's signs, which were prohibited:

1.  The City issued permits in January 2011 for supergraphic signs on the Hollywood Metropolitan Hotel at 5825-5827 Sunset Blvd. in the Hollywood SUD without requiring the developers of the site to comply with the sign take-down or reduction program in the Original Hollywood SUD.  (SAC ¶ 49(a)(1).)  Paramount claims that the developers were allowed a 1-to-35 take-down ratio, were permitted to use non-standard materials, and were given a twenty-year permit, which doubled the length of a standard permit.  (Id.)  Paramount claims that these allowances were more lenient than those the City required of it and that the City found these supergraphic signs, which were similar to Paramount's signs, would have no negative impact on the visual environment.  (Id.)

2.  In July 2010, the City permitted supergraphic signs on the "W" Hotel at 6250 W. Hollywood Blvd. and the Legacy Apartments at 1600 N. Vine St. in the Hollywood SUD by allowing variances without compliance with the take-down or in lieu fees under the Original Hollywood SUD.  (SAC ¶ 49(a)(2).)

3.  On November 17, 2010, the City permitted CBS Outdoor to erect supergraphic signs at 6725 Sunset Blvd. in the Hollywood SUD, which Paramount alleges was "in compliance with the City's sign regulations."  (SAC ¶ 49(a)(3).)

4.  In 2010, the City permitted supergraphic signs on the building at 6933 W. Hollywood Blvd. in the Hollywood SUD without requiring the company to comply with the sign reduction program in the Original Hollywood SUD and requiring the company to pay only $39,000

as an "in lieu" fee, which contrasted with the $1.2 million required from Paramount.  (SAC ¶ 49(a)(4).)

5.   The City permitted supergraphics at the L.A. Live Complex in 2009, which is not within the Hollywood SUD.  (SAC ¶ 49(a)(5).)

6.   The City recently allowed supergraphic signs at 7021 Hollywood Blvd. in the Hollywood SUD.  (SAC ¶ 49(a)(6).)

7.   In 2009 and 2010, the City permitted supergraphic signs on the Marriot/Ritz Carlton downtown, which is not within the Hollywood SUD.  (SAC ¶ 49(a)(7).)

8.   As recently as December 2010, the City approved supergraphic signs at 6200 W. Hollywood Blvd. in the Hollywood SUD, but "may not have" required the owner to take down its own signs, instead giving credit for taking down others' signs, and may have granted variances to erect more signs than would have been allowed under the Original Hollywood SUD.

9.   In October 2008, the City and the CRA permitted supergraphic signs at 1480 Vine St./6290 Hollywood Blvd. for CIM, allowing CIM to pay a smaller "in lieu" fee than Paramount under the sign reduction program in the Original Hollywood SUD.  (SAC ¶ 49(a)(9).)  The City's Planning Department found that CIM's signs would not negatively impact the visual environment, even though they were similar to Paramount's.  (Id.)

10.   In August 2010, the City permitted supergraphic signs at 1724 Highland Blvd. in the Hollywood SUD.  (SAC ¶ 49(a)(10).)

11.   On May 21, 2010, the City permitted CIM to erect a "roof sign" at 6904 W. Hollywood Blvd. in the Hollywood SUD, which Paramount claims was akin to a supergraphic sign, but was not required to comply

with the Original Hollywood SUD's restrictions on supergraphics.  (SAC ¶ 49(a)(11).)

12.  In February 2011, the City entered a settlement agreement with CBS Outdoor regarding four properties (1025 Highland Ave., 939 S. Figueroa St., 6253 Hollywood Blvd., and 115 W. Washington Blvd.) and permits for three of these properties were deemed to be vested under the Amended Hollywood SUD, which allowed CBS Outdoor to erect signs at those locations.  (SAC ¶ 49(a)(12).)

13.  The City permitted three illuminated supergraphic signs at 1800 Highland Ave. on February 10, 2011, pursuant to a project approved by the CRA in November 2008, which contained exceptions to the Original Hollywood SUD's take-down requirements.  (SAC ¶ 49(a)(13).)

14.  The CRA "recently" approved supergraphic signs at 5939 Sunset Blvd. in the Hollywood SUD.  (SAC ¶ 49(a)(14).)

15.  The City "has allowed supergraphics to be maintained" at 1735 Vine St. in the Hollywood SUD.  (SAC ¶ 49(a)(15).)  (FAC ¶ 49(a).)

**B.   Free Speech Claims**

Paramount once again advances various free speech claims, identifying ten reasons why the City's Sign Regulations, including the Sign Ordinances and the Original and Amended Hollywood SUDs have violated Paramount's free speech rights:

1.  Paramount's first claim is an as-applied challenge under Central Hudson[2] to the Original Hollywood SUD because the City applied it to Paramount but did not apply it to ban other companies'

---

[2]Central Hudson Gas & Elec. Corp. v. Pub. Servs. Comm'n, 447 U.S. 557 (1980).

7

supergraphic signs.  (SAC ¶ 62(1).)  Paramount alleges that any ban on supergraphic and offsite signs in the Original Hollywood SUD, including signs subject to the Sign Reduction Program, failed to advance the City's goals because the City granted numerous permits that worked at cross-purposes with the stated reasons for the ban and irrationally distinguished speakers.  (SAC ¶ 62(1)(a)–(b).)  Further, the ban on supergraphics signs was underinclusive because other types of signs, such as digital signs, roof top signs, and billboards, were permitted and have become prevalent in the Hollywood SUD.  (SAC ¶ 62(1)(c).)

2.  Paramount's second claim is an as-applied <u>Central Hudson</u> challenge to the City's Sign Regulations because they granted irrational exceptions to the supergraphic and offsite sign bans in the same way as alleged in claim one, above.

3.  Paramount's third claim is an as-applied <u>Central Hudson</u> challenge to the Amended Hollywood SUD for the same reasons as noted above, based on signs allowed after the November 17, 2010 effective date of the Amended Hollywood SUD.  (SAC ¶ 62(3).)[3]  Paramount points to four such locations for supergraphic signs that have been permitted at 6200 Hollywood Boulevard, 5825 West Sunset Boulevard, 6725 Sunset Boulevard, and 1800 North Highland Avenue, all within the Hollywood SUD.  (<u>Id.</u>)  Paramount claims that the City will also allow fifteen additional supergraphic signs pursuant to a "grandfathered" provision in the Amended Hollywood SUD.  (<u>Id.</u>)

---

[3]The Court previously dismissed Paramount's <u>Central Hudson</u> claim directed at the Amended Hollywood SUD because all of the alleged exceptions were granted before the Amended Hollywood SUD took effect in November 2010.  (Docket No. 67 at 27–28.)  The Court granted Paramount leave to amend to allege exceptions to the Amended Hollywood SUD.

4.  Paramount's fourth claim advances an as-applied "unbridled discretion" challenge that the Original Hollywood SUD gave city officials unfettered discretion to permit or prohibit speech.  (SAC ¶ 62(4).)  Particularly, the Original Hollywood SUD's "sign reduction program" allowed officials to grant permits to projects that would have been "beneficial" to the area, but did not also create standards to allow for judicial review.  (_Id._)  The "as-applied" portion of this claim states in total: "In contrast to other parties, City administrators refused to even process or review Paramount's applications and knowingly subjected it to the delegated whims of CRA officials, knowing that other parties were receiving more favorable treatment."  (_Id._)[4]

5.  Paramount's fifth claim sets forth an as-applied "unbridled discretion" challenge that the Amended Hollywood SUD does not set objective guidelines for allowing supergraphic signs and perpetuates prior discriminatory decisions by creating "grandfathered," "tolling," and "vesting" exceptions to the blanket ban on supergraphic signs. (SAC ¶ 62(5).)  Particularly, Paramount claims that there are no objective standards to interpret and apply the terms "substantial liabilities," "substantial work," or "good faith reliance," which are used to determine whether the "grandfathered" and "vesting" exceptions in the Amended Hollywood SUD apply to a particular sign.  (_Id._) Paramount points to several supergraphic signs that have fallen within these exceptions: three supergraphics at 1800 Highland Avenue; supergraphics at 5825–5827 Sunset Boulevard; and supergraphics at 6725

---

[4]The parties' additional briefing following the dismissal of the appeal in _Paramount I_ focused on this claim.

Sunset Boulevard and other properties on behalf of CBS Outdoor, Inc. (Id.)

6.  Paramount's sixth claim asserts an as-applied First Amendment challenge to the Original and Amended Hollywood SUDs because they favor large companies who own billboard structures and could afford to take down some signs under the sign removal program or purchase "take-down rights" from other entities, which resulted in viewpoint discrimination against speakers who could not afford to participate in the program.  (SAC ¶ 62(6).)

7.  Paramount's seventh claim alleges an as-applied First Amendment challenge to the Original Hollywood SUD because the "in lieu" fee required to erect supergraphic signs was an "illegal charge for, and tax on, speech" that carried no standards to fix the amount of fees.  (SAC ¶ 62(7).)

8.  Paramount's eighth claim asserts an as-applied First Amendment challenge to actions by the City in ignoring Paramount's permit requests and allowing City officials to influence the permitting process in favor of other entities.  (SAC ¶ 62(8).) Particularly, Paramount claims that the City allowed officials in the Planning Department, the Department of Building Safety, the Fire Department, and the Hollywood Community Redevelopment Agency (the "CRA") to deny Paramount's permit applications, while accepting others' applications for similar signage.  (Id.)

9.  Paramount's ninth claim asserts the same speech claims against the Original and Amended Hollywood SUDs as outlined above, but under the California Constitution's protection of commercial speech. (SAC ¶ 62(9).)

1      10.   Finally, Paramount's tenth claim seeks a declaration that

2   Paramount's permit applications should be deemed "vested" and

3   "grandfathered" under the Amended Hollywood SUD because, but for the

4   unlawful denial of permits under the Original Hollywood SUD, Paramount

5   could take advantage of those provisions to obtain permits.  (SAC ¶

6   62(10).)

7      **C.   Equal Protection and Takings Claims**

8      Based on the same set of facts, Paramount also advances equal

9   protection and takings claims.  Paramount's equal protection claims

10  rest on essentially the same allegations as its free speech claims,

11  i.e., that similarly situated sign companies have been given permits

12  to erect supergraphic signs on different terms than those offered to

13  Paramount.  (SAC ¶ 71.)  Paramount's takings claim alleges an "as-

14  applied" challenge that the City imposed conditions on Paramount's

15  permit requests that had no nexus with any legitimate interest of the

16  City.  (SAC ¶ 82.)  Among the fees and other requirements, the City

17  demanded that Paramount dedicate a portion of the Sunset Properties

18  for public use as a parking structure, construct another level of

19  parking "presumably for public use," and maintain a certain "class" of

20  tenants and quality to its building, "also presumably for the public's

21  benefit."  (Id.)

22                        **LEGAL STANDARD**

23     A complaint survives a motion to dismiss under Rule 12(b)(6) if

24  it contains a "short and plain statement of the claim showing that the

25  pleader is entitled to relief," which does not require "detailed

26  factual allegations," but it "demands more than an unadorned, the-

27  defendant-unlawfully-harmed-me accusation."  <u>Ashcroft v. Iqbal</u>, __

28  U.S. __, __, 129 S. Ct. 1937, 1949 (2009).  A claim must be "plausible

on its face," which means that the Court can "draw the reasonable
inference that the defendant is liable for the misconduct alleged."
Id.; see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In
other words, "a plaintiff's obligation to provide the grounds of his
entitlement to relief requires more than labels and conclusions, and a
formulaic recitation of the elements of a cause of action will not
do."  Twombly, 550 U.S. at 555 (internal quotations and alterations
omitted).  Allegations of fact are taken as true and construed in the
light most favorable to the nonmoving party.  See Newdow v. Lefevre,
598 F.3d 638, 642 (9th Cir. 2010), cert. denied, 131 S. Ct. 1612
(2011).

In analyzing the sufficiency of the complaint, the Court must
first look at the requirements of the causes of action alleged.  See
Iqbal, 129 S. Ct. at 1947.  The Court may then identify and disregard
any legal conclusions, which are not subject to the requirement that
the Court must accept as true all of the allegations contained in the
complaint.  Id. at 1949.  The Court must then decide whether well-
pleaded factual allegations, when assumed true, "plausibly give rise
to an entitlement to relief."  Id. at 1950.  In doing so, the Court
may not consider material beyond the pleadings, but may consider
judicially noticeable documents, documents attached to the complaint,
or documents to which the complaint refers extensively or which form
the basis of the plaintiff's claims in the complaint.  See United
States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

**DISCUSSION**

The City has moved to dismiss all of Paramount's claims on
various grounds, each of which is discussed below.  However, both

parties have requested judicial notice of documents to support their

positions, and the Court addresses those requests first.

**I.   Requests for Judicial Notice**

      **A.   <u>City's Request</u>**

      In an effort to defeat Paramount's allegations that it was

treated differently than the owners of supergraphic signs at certain

identified addresses, the City seeks judicial notice of, inter alia,

documents related to the sign and permit approvals for those

locations.  (City's Feb. 28, 2011 Supp. Request for Judicial Notice

("RJN"), Exs. 1–6, 8–9, 11, 15.)  The City claims that these documents

are public records properly subject to judicial notice, <u>see</u> <u>Santa</u>

<u>Monica Food Not Bombs v. City of Santa Monica</u>, 450 F.3d 1022, 1025 n.2

(9th Cir. 2006), and may be considered on a motion to dismiss because

they are incorporated into the SAC by reference, <u>see</u> <u>Ritchie</u>, 342 F.3d

at 908.

      The Court disagrees.  First, even if the Court could judicially

notice the documents relating to permit approvals as public records,

that notice only extends as far as noticing that the documents exist;

the Court may not take notice of the truth of the contents of those

documents, since the contents are subject to vigorous dispute.  <u>See</u>

<u>id.</u> at 909 (reasoning that "[c]ourts may take judicial notice of some

public records, including the 'records and reports of administrative

bodies,'" but not all public records fit into this exception,

especially when the information in the records is disputed); <u>Troy</u>

<u>Group, Inc. v. Tilson</u>, 364 F. Supp. 2d 1149, 1152 (C.D. Cal. 2005)

(denying request for judicial notice of "'court documents provided for

the truth of the facts asserted therein' when such documents contain

'facts essential to support a contention in a cause then before

it.'"). A large portion of Paramount's case turns on the propriety of the City's permit approvals for other sign companies. Therefore, while the Court may take notice that these documents exist, the Court may not assess their truth in resolving the instant motion.

Second, these documents do not fall within the "incorporation by reference" doctrine. On a motion to dismiss, a court may consider documents not attached to the complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim," Ritchie, 342 F.3d at 908, and "'whose authenticity no party questions,'" Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005). However, Paramount "does not concede" the authenticity of the documents (Opp'n to City's Feb. 28, 2011 Supp. RJN 2) because it has no way to verify that these documents are, in fact, what the City claims they are without conducting discovery.

Further, while Paramount referred to permit approvals for the sign locations in the SAC, those allegations are not so "extensive" to mandate incorporating those documents into the SAC. "Extensively" referring to a document occurs, for example, "when a plaintiff's claim about insurance coverage is based on the contents of a coverage plan . . . or when a plaintiff's claim about stock fraud is based on the contents of SEC filings . . . ." Ritchie, 342 F.3d at 908. Here, absent discovery, Paramount has alleged, at most, a partial picture of the permit approvals at various locations; it has no access to emails, correspondence, notes, draft approvals, etc., that might paint a fuller picture of the permitting process at these locations. These documents are therefore not properly considered at the motion to dismiss stage and the City's request for judicial notice of them is DENIED.

14

 1     The City also requests judicial notice of several court records:
 2  a petition for a writ of mandamus and mandate filed in Los Angeles
 3  Superior Court in Regency Outdoor Advertising, Inc. v. City of Los
 4  Angeles, et al., Case No. BS121645 (L.A. Super. Ct., filed July 1,
 5  2009); and a stipulation and proposed judgment in People v. CBS
 6  Outdoor Inc., Case No. BC454211 (L.A. Super. Ct., filed on Feb. 1,
 7  2011).  (City's Feb. 28, 2011 Supp. RJN, Exs. 7, 10.)  As with public
 8  records, the Court may judicially notice the existence of court
 9  records, but it may not notice the truth of their content.  See Wyatt
10  v. Terhune, 315 F.3d 1108, 1114 & n.5 (9th Cir. 2003); Lee v. Cty. of
11  Los Angeles, 250 F.3d 668, 689—90 (9th Cir. 2001).
12     The City explains that the writ in the Regency Outdoor case was
13  offered merely to show that a dispute exists between Regency and the
14  City as to the take-down credits at the 6200 Hollywood Blvd. location,
15  which does not implicate the truth of any facts in that filing and is
16  a proper subject of judicial notice.  Moreover, the City explains that
17  the settlement agreement and judgment in the CBS Outdoor case were
18  offered to rebut Paramount's claim that the City "gave away" sign
19  rights as part of that settlement because the settlement agreement
20  contains no such term.  The Court may judicially notice the existence
21  of terms included in the settlement agreement, which is not subject to
22  reasonable dispute.  Thus, the Court GRANTS judicial notice of these
23  two documents for these purposes.
24     Paramount does not dispute that several other exhibits offered by
25  the City are subject to judicial notice, such as the Los Angeles
26  Sports and Entertainment Complex Specific Plan; section 271 of the
27  City's Charter; and a February 24, 2011 letter to the City from
28  Paramount. (City's Feb. 28, 2011 Supp. RJN, Exs. 12—14).  Paramount

1  also does not object to the City's request for judicial notice of the

2  Ninth Circuit mandate in <u>Paramount I</u>; the transcript of oral argument

3  on appeal in <u>Paramount I</u>; the CRA Amended Design for Development of

4  Signs in Hollywood; the April 28, 2008 Statement of Genuine Issues

5  from <u>Paramount I</u>; and the Declaration of Bradley Folb filed in

6  response to the motion to dismiss the appeal in <u>Paramount I</u>.  (City's

7  June 30, 2011 RJN, Exs. A—E.)  The Court GRANTS the City's request as

8  to these documents.

9      **B.   <u>Paramount's Requests</u>**

10      Paramount requests judicial notice of photographs of signs

11  erected throughout the City and drawings of proposed projects that

12  would include supergraphic signs.  (Paramount's March 14, 2011 RJN,

13  Exs. A—I.)  However, all of these documents are subject to reasonable

14  dispute as to their authenticity and the accuracy of their content.

15  <u>See</u> <u>Ritchie</u>, 342 F.3d at 909.  Thus, the Court DENIES Paramount's

16  request for judicial notice of these documents.  The Court may,

17  however, take judicial notice of a photograph submitted by the City of

18  a building located at 1800 Highland Avenue.  (City's March 21, 2011

19  Supp. RJN, Ex. 16.)  As will be discussed <u>infra</u>, the only relevance of

20  this exhibit is to show that the building has a split facade, which is

21  not subject to dispute.

22      In support of its supplemental briefing on the effect of the

23  resolution of <u>Paramount I</u>, Paramount submitted 15 additional exhibits,

24  but did not request judicial notice of them.  (Paramount's June 17,

25  2011 RJN.)  All but one appear to be court documents, so the Court

26  GRANTS judicial notice of them within the parameters discussed above.

27  (<u>Id.</u>, Exs. A—N.)  One exhibit is a 2007 letter from the City to

28  Paramount's former counsel.  (<u>Id.</u>, Ex. O.)  The City has not disputed

its contents, so the Court GRANTS judicial notice of that document as well.

**II.  Motion to Dismiss**

 **A. Claim 1: As-Applied Central Hudson Challenge to the Original Hollywood SUD**

 For its first claim, Paramount alleges a <u>Central Hudson</u> challenge to the Original Hollywood SUD that boils down to a claim that the City's interests in traffic safety and aesthetics are undermined by numerous exceptions granted under the Original Hollywood SUD.  The Court previously dismissed as moot all of Paramount's claims for injunctive relief against the repealed Original Hollywood SUD, leaving only damages claims directed at the Original Hollywood SUD.  (Docket No. 67 at 13—15.)

 The City moves to dismiss this claim for damages on two grounds. First, Paramount's remaining claims for damages directed at the Original Hollywood SUD fail because Paramount cannot allege that its own speech rights were violated.  Therefore, it may not recover damages for purely economic harm from not being able to enter contracts with advertisers to erect commercial supergraphic signs. Second, Paramount has not stated a claim that the exceptions to the Original Hollywood SUD so undermined the City's interests served by limiting supergraphic signs that the City has violated <u>Central Hudson</u>. While the City's first argument fails, the City is correct that Paramount is unable to state a <u>Central Hudson</u> underinclusivity claim.

  1. <u>Damages for Violations of Paramount's Own Speech Rights</u>

 Given that Paramount may only recover damages for its remaining claims against the Original Hollywood SUD, the City invokes three cases to argue that the nature of Paramount's business model —

erecting commercial signs for advertisers for a fee — prevents

Paramount from recovering damages for a violation of its <u>own</u> speech

rights.  See <u>Outdoor Media Group, Inc. v. City of Beaumont</u>, 702 F.

Supp. 2d 1147, 1161—63 (C.D. Cal. 2010); see also <u>Pitt News v. Fisher</u>,

215 F.3d 354, 365—66 (3d Cir. 2000); <u>Warner Cable Commc'ns, Inc. v.</u>

<u>City of Niceville</u>, 911 F.2d 634, 638—40 (11th Cir. 1990).  Using a

broad brush, the City paints this authority (especially <u>Outdoor Media</u>)

as holding that, because Paramount profits from allowing advertisers

to use its sign locations for a fee, Paramount's own speech rights

have not been violated in any way that gives rise to damages for First

Amendment violations.  The Court is not convinced that this line of

authority defeats Paramount's damages claims for this reason.

    In <u>Outdoor Media</u>, sign companies that leased outdoor advertising

space to the public sought but were denied permits to erect four

billboards.  702 F. Supp. 2d at 1150.  The city repealed the ordinance

on which the denials were based, and, after appeal and remand, the

companies' only remaining claims against the repealed ordinance were

for damages.  See <u>Outdoor Media Group, Inc. v. City of Beaumont</u>, 506

F.3d 895, 906 (9th Cir. 2007).  The district court granted summary

judgment to the city on those claims because it found that, under the

facts of the case, the companies no longer had any First Amendment

interest in their billboards — they had "sold all of their rights and

interest in the permit application to Lamar, a comparable outdoor

advertising company, thereby relinquishing their position as the

purported owners and operators of the unbuilt billboards." <u>Outdoor</u>

<u>Media</u>, 702 F. Supp. 2d at 1157.  As a result, the only remaining harm

to the companies was the "purely economic" harm of a lowered contract

price for the sale of the sign permits; they could not point to any

"expressive conduct they planned to undertake" but could not because
of the city's prohibition.  Id. at 1162—63.

Unlike this case, the facts in Outdoor Media were unique: there,
the sign company had conveyed its rights to erect signs, so the only
injury truly at stake was the value of the contract to sell those
rights to another speaker.  Here, by contrast, Paramount maintains
control of the advertising content of its supergraphic signs — albeit
for paying commercial customers — so its own ability to erect signs
has been implicated by the City's alleged actions.  See Preferred
Commc'ns, Inc. v. City of Los Angeles, 754 F.2d 1396, 1410 n.10 (9th
Cir. 1985) (explaining that cable operators, theater owners,
booksellers, and concert promoters all control the content of their
speech, but "[t]heir First Amendment protection is not diminished
because they distribute or present works created by others."), aff'd,
476 U.S. 488 (1986).

The court in Outdoor Media relied on, inter alia, Pitt News and
Warner Cable, but, like Outdoor Media, those cases are also
distinguishable from the circumstances here.  In Warner Cable, for
example, the court rejected a First Amendment challenge to a municipal
ordinance that allowed the city to operate its own cable system in
direct competition with the plaintiff/private cable operator, which
seriously undermined the private cable provider's economically
competitive position in the market, but imposed no direct burden on
the operator's right to speak.  See 911 F.2d at 638 ("What the City's
ordinance does abridge is the continuation of Warner's profitable
position as the only speaker in the captive cable market" which was an
"economic loss," not a "first amendment injury." (emphasis in
original)).  Similar to Warner Cable, Pitt News involved a challenge

19

1  to a law that prohibited certain advertising for alcohol in a college

2  newspaper, which created a severe economic burden on the newspaper,

3  but imposed no direct burden on the newspaper's speech rights.   215

4  F.3d at 366.   Here, by contrast, the Original Hollywood SUD imposed a

5  direct burden on sign companies like Paramount, preventing them from

6  erecting any commercial supergraphic signs without meeting certain

7  conditions.   This was not simply an economic side-effect of a

8  regulation like those in Warner Cable and Pitt News, which were not

9  directed at curtailing the plaintiffs' speech.[5]

10  Also, Warner Cable and Pitt News did not deal with the "'law of

11  billboards,'" which is a "'method of communicating ideas . . . unto

12  itself.'"   World Wide Rush v. City of Los Angeles, 606 F.3d 676, 684

13  (9th Cir. 2010).   Indeed, to support its "economic damages" theory in

14  the context of limits on commercial signs, the City has identified

15  only Outdoor Media among scores of cases in the 30 years since the

16  Supreme Court decided the seminal commercial-billboard case.[6]   It is

17  curious that no other commercial signage case has addressed this issue

18  before now and the Court finds the contention unpersuasive.

19          2.   Sufficiency of Paramount's Central Hudson Allegations

20               Against the Original Hollywood SUD

21  Paramount must satisfy four elements in order to allege an as-

22  applied Central Hudson claim:

23          [5]Indeed, Pitt News is particularly unpersuasive here because the

24  issue was decided on an appeal from the denial of a preliminary
    injunction, and in a later appeal from the grant of summary judgment

25  to the defendants, the Third Circuit concluded that the law did, in
    fact, violate the newspaper's First Amendment rights.   Pitt News v.

26  Pappert, 379 F.3d 96, 112 (3d Cir. 2004) (distinguishing, inter alia,
    Warner Cable).

27
            [6]Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 510—11

28  (1981).

> (1) if the communication is neither misleading nor related to unlawful activity, then it merits First Amendment scrutiny as a threshold matter; in order for the restriction to withstand such scrutiny, (2) the State must assert a substantial interest to be achieved by restrictions on commercial speech; (3) the restriction must directly advance the state interest involved; and (4) it must not be more extensive than is necessary to serve that interest.

World Wide Rush, 606 F.3d at 684 (internal quotation marks and alterations omitted) (quoting Metro Lights, 551 F.3d at 903).  When a party points to exceptions to a sign ban that allegedly undermine the interests to be served by the ban, the critical focus is whether the City "'denigrates its interest in . . . safety and beauty and defeats its own case by permitting'" some signs despite the ban, while forbidding others.  Id. at 685 (ellipsis in original).  "'To put it in the context of the Central Hudson test, a regulation may have exceptions that undermine and counteract the interest the government claims it adopted the law to further; such a regulation cannot directly and materially advance its aim,' and is, therefore, unconstitutionally underinclusive."  Id. (quoting Metro Lights, 551 F.3d at 905).

Regulations are fatally underinclusive under Central Hudson in two situations: first, if the exception ensures that the regulation will fail to achieve its end, then it does not materially advance its aim; and second, exceptions that make distinctions among different kinds of speech must relate to the interests the government seeks to advance.  Metro Lights, 551 F.3d at 906.  When assessing underinclusivity under the third Central Hudson prong, the Court focuses on "whether the City's ban advances its interest in its general application, not specifically with respect to" the plaintiff,

id. at 904, and under the fourth Central Hudson prong of narrow tailoring, the Court need not require that the government use the least restrictive means to further its ends, id. at 906.  In the end, the Court should defer to "a municipality's reasonably graduated response to different aspects of a problem." Id. at 910.

Paramount alleges that the City has granted permit approvals for signs in at least 15 different locations in and out of the Hollywood SUD, which demonstrate that the City unevenly enforces the Original Hollywood SUD, thereby undermining its goals in traffic safety or aesthetics.  Similar claims were rejected in World Wide Rush, Metro Lights, and most recently in Vanguard.

In World Wide Rush, the court rejected an underinclusivity claim based upon two exceptions to the City's ban on billboards adjacent to freeways because those two exceptions did not so undermine the City's interests in safety and aesthetics as to render the ban unconstitutionally underinclusive.  606 F.3d at 685—87.  The court urged judicial deference to a "'municipality's reasonably graduated response to different aspects of a problem'" and directed that a "holistic" approach must be taken when assessing exceptions to the ban, rather than considering each exception in isolation.  Id. at 685. And when the court reviewed the exceptions at issue in that case, it found that they furthered the City's interests by, for example, removing blight and dangerous conditions and improving traffic flow and otherwise reducing signage.  Id.

Setting out similar principles, Metro Lights also rejected a Central Hudson underinclusivity challenge to the City's ban on offsite signs and approved a contract with the City that allowed a sign company to install thousands of signs at transit stops.  551 F.3d at

901.  The contract did not fatally undermine the City's interests in
traffic safety and aesthetics for several reasons: first, the sign ban
still achieved its aim to reduce signage in the City, id. at 910;
second, the contract gave the City power to control a single sign
provider and exclude others at transit stops, which prevented numerous
disparate parties from posting signs, id.; and third, the City's
judgment that its interests in a complete ban on signage should yield
to controlled signage at transit stops was a "classically legislative
decision," id. at 910—11.  The City's contract did not work at
"inexorable cross-purposes" with its interests served by banning signs
because "a regime that combines the Sign Ordinance and the [contract]
still arrests the uncontrolled proliferation of signage and thereby
goes a long way toward cleaning up the clutter, which the City
believed to be a worthy legislative goal."  Id. at 911.

Finally, Vanguard addressed an underinclusivity argument very
close to Paramount's here.  The court reviewed and synthesized World
Wide Rush and Metro Lights and reached these conclusions:

> Several points can be gleaned from the
> decisions in World Wide Rush and Metro Lights.
> First, the City's sign ban can withstand a Central
> Hudson attack so long as it is not "so pierced by
> exceptions and inconsistencies," as to directly
> undermine the City's interests in traffic safety
> and aesthetics.  And those exceptions cannot be
> viewed in isolation or parsed too finely; the
> exceptions must be looked at holistically in the
> context of the entire regulatory scheme.  Second,
> a Central Hudson challenge is not focused on the
> particular plaintiff; instead, the Court must look
> at "whether the City's ban advances its interests
> in its general application, not specifically with
> respect to" a particular speaker.  Third, the
> court must defer to the reasonable legislative
> judgements of the City on how best to advance its
> own interests in aesthetics and traffic safety.
> To combat the proliferation of supergraphics that
> have blanketed the City, the City may take a
> graduated response, even going so far as granting

> exceptions for thousands of signs over which it
> can exercise control. That response
> unquestionably includes exercising its classically
> legislative function of creating exceptions to the
> sign bans for SUDs and development agreements, so
> long as those judgments are reasonable in light of
> the City's interests.

Vanguard, 2011 WL 2175891, at *6.

The court then rejected the sign company's claims. As relevant here, the sign company had argued that the City impermissibly distinguished between its prohibited supergraphic signs and identical but permitted supergraphic signs elsewhere in the City. Id. at *7. The claim failed because the permitted signs were located within approved SUDs or "special property development projects," and under World Wide Rush and Metro Lights, "[i]f the City can validly enact SUDs to permit signs, then certainly it may constitutionally permit sign owners to erect signs in those districts without running afoul of Central Hudson." Id. The sign company had also argued that the City permitted offsite signs at 10 locations not within any SUD that were similar to the plaintiff's signs. Id. at *8. The court rejected this argument not only because the City provided evidence that these signs had been permitted or approved before the offsite sign ban, but also because these exceptions "came nowhere near" demonstrating that the offsite sign ban was so pierced with exceptions as to render it fatally underinclusive. Id. at *8.

In light of these cases, then, Paramount must allege that the permitted signs rendered the Original Hollywood SUD "'so pierced by exceptions and inconsistencies' as to be unconstitutionally underinclusive." World Wide Rush, 606 F.3d at 686. In considering this claim, the Court need not consider signs erected outside the Hollywood SUD because they cannot demonstrate that the City has

undermined the specific interests advanced by the Original Hollywood

SUD.  See Vanguard, 2011 WL 2175891, at *7—8.  The signs located at

the following addresses are located within the Hollywood SUD: the

Hollywood Metropolitan Hotel at 5825-5827 Sunset Blvd.; the "W" Hotel

at 6250 W. Hollywood Blvd. and the Legacy Apartments at 1600 N. Vine

St.; 6725 Sunset Blvd.; 6933 W. Hollywood Blvd.; 7021 Hollywood Blvd.;

6200 W. Hollywood Blvd.; 1480 Vine St./6290 Hollywood Blvd.; 1724

Highland Blvd.; 6904 W. Hollywood Blvd.; 1025 Highland Ave., 939 S.

Figueroa St., 6253 Hollywood Blvd., and 115 W. Washington Blvd. (all

owned by CBS Outdoor); 1800 Highland Ave.; 5939 Sunset Blvd.; and 1735

Vine St.

Even for the signs allowed within the Hollywood SUD, the Court

may not parse these exceptions "too finely" and must view them in the

context of the entire legislative scheme.  Vanguard, 2011 WL 2175891,

at *6.  This principle is particularly important here because the

Original Hollywood SUD did not completely ban supergraphic signs.

Instead, it permitted supergraphic signs if other signs were removed

pursuant to the sign reduction program or the owner entered an

agreement with the CRA that contained "performance, one-time fee, or

on-going revenue provisions that allow[] the CRA to undertake

projects, programs or other activities that improve the visual

environment in a redevelopment project area."  (City's Nov. 17, 2010

RJN, Ex. 13 at 286, § 9.)  This regulation therefore adopted a

specific scheme — short of a complete ban — to advance the City's

aesthetic and safety interests in the Hollywood SUD.[7]  As a result,

---

[7]Paramount suggests in passing that the City has offered new
"post hoc" reasons for granting exceptions under the Original
Hollywood SUD, such as "blight removal," which differ from the City's
(continued...)

any sign company that complied with the Original Hollywood SUD — even

if on terms more favorable than those offered to Paramount — advanced

the City's interests and those signs cannot properly be considered

"exceptions" that undermined the Hollywood SUD.  When the locations

are viewed in the context of the entire legislative scheme, the

permitted signs alleged by Paramount come "nowhere near" demonstrating

that the Original Hollywood SUD was so pierced with exceptions as to

render it fatally underinclusive.  See Vanguard, 2011 WL 2175891, at

*8.

### 5825—5827 Sunset

Paramount alleges that some agreement existed between this

property owner and the City to reduce signage, albeit on far less

onerous terms than those offered to Paramount for its supergraphic

signs.  Paramount also alleges that the City concluded that these

signs would not have "a negative impact on the visual environment,"

even though Paramount's similar supergraphic signs were not allowed.

These allegations do not undermine the City's interest in

improving the visual environment through the Original Hollywood SUD.

Indeed, this was not even an "exception" to the Original Hollywood

SUD, but an example of enforcement of the requirement to reduce

signage, even if on terms more favorable than those offered to

Paramount.  Just as the sign reduction requirement in the Original

Hollywood SUD advanced the City's interest in improving the visual

environment, so, too, did actually requiring the property owner to

[7](...continued)
original interests in traffic safety and aesthetics.  But traffic
safety and aesthetics are broad categories that could certainly
include things like blight removal.  See World Wide Rush, 606 F.3d at
686 (approving of exception to sign ban that may have improved "an
otherwise dangerous and blighted downtown area.").

adhere to it.  Similarly, the finding that the proposed signs at this
location had no negative impact on the visual environment directly
advanced the City's interest, even if Paramount's signs would
similarly have had no negative impact on the visual environment.
Viewing the alleged circumstances of the signage at this location as a
whole, this arrangement in no way undermined the City's interest in
improving the visual environment under the Original Hollywood SUD.

### 6250 W. Hollywood/1600 N. Vine (W Hotel/Legacy Apartments)

Paramount alleges that the City granted "variances" from the
Hollywood SUD to the property owner at this location, which allowed a
200% increase in supergraphic sign area without a commensurate take-
down requirement or "in lieu" fees.  The City responds by offering a
document containing the findings supporting the CRA's approval of the
project, which concluded that the area was blighted and the sign
agreement was part of an agreement by the developer to invest hundreds
of millions of dollars in the area.  The Court has declined to take
judicial notice of this document, so it cannot consider it in
assessing Paramount's claims.  Nevertheless, in allowing the
supergraphic signs at this location, "[t]he City . . . reasonably may
have concluded that the benefits of redeveloping and attracting people
to an otherwise dangerous and blighted . . . area outweighed the harm
of additional" supergraphic signs there.  World Wide Rush, 606 F.3d at
686.  Thus, this location does not demonstrate an "exception" that
undermines the purposes of the Original Hollywood SUD.

### 6725 Sunset Blvd.

Paramount alleges that this sign complied with the City's sign
regulations.  Needless to say this does not plausibly allege an
"exception" to support a Central Hudson underinclusivity claim.

### 6933 W. Hollywood Blvd.

Paramount alleges that the owner at this site was only required to pay a $39,000 fee to erect signs, while Paramount was charged $1.2 million in "in lieu" fees to erect their signs.  The City relies on documents related to this site to argue that a billboard was required to be removed as well, but the Court has denied the City's request for judicial notice of these documents and they cannot be considered. Nevertheless, Paramount admits in its opposition that the property owner at this location was required to take down some signage.  As discussed above, even if on more favorable terms that those offered to Paramount, the $39,000 fee and the take-down of even a minimal amount of signage advanced the City's interest in improving the visual environment under the Original Hollywood SUD.[8]

### 7021 Hollywood Blvd., 5939 Sunset Blvd., 1735 Vine St., & 1724 Highland Ave.

Paramount alleges only that supergraphic signs have been allowed at these locations.  These bare allegations do not plausibly show a Central Hudson violation because the Original Hollywood SUD did not ban all supergraphic signs and these signs could have complied with the terms of the Original Hollywood SUD and advanced the City's interests.  See World Wide Rush, 606 F.3d at 686.

### 6200 W. Hollywood Blvd.

Paramount alleges that the City approved supergraphic signs at this location and "may not have even required the property owners or

---

[8]Paramount argues that there is no way to know what the $39,000 was spent on, but there is.  One need only read the Original Hollywood SUD to know that the fee was to be used for "projects, programs, or other activities that improve the visual environment in a redevelopment project area." (City's Nov. 17, 2010 RJN, Ex. 13 at 286, § 9.)

1  developers to take down signs they owned, but instead gave credit for

2  take-downs of disputed signs that another sign company . . . claimed

3  to own."  The Court has taken judicial notice of the filing in the

4  Regency case, which demonstrates that there is a dispute over who

5  should receive the credits related to this location.  As the City

6  explains, no matter who prevails, the signs will be removed, which

7  advances the City's interests under the Original Hollywood SUD and

8  cannot show a plausible exception that undermines the City's

9  interests.

10                **1480 Vine St./6290 Hollywood Blvd.**

11      Paramount alleges that the property owner at these sites entered

12  an agreement with the CRA, which was approved by the City, in which

13  the owner paid lower "in lieu" fees than those demanded from

14  Paramount.  Paramount also alleges that the City's Planning Department

15  concluded that these signs would not "harm the visual environment."

16  Like the supergraphic signs at 5825–5827 Sunset Blvd., the fact that

17  this owner complied with the Original Sign Ordinance, even if on more

18  favorable terms than offered to Paramount, directly advances the

19  City's interests and does not constitute an "exception" giving rise to

20  a Central Hudson claim.

21                   **6904 W. Hollywood Blvd.**

22      Paramount alleges that the owner at this site was permitted to

23  erect a "3024-square-foot off-site open panel roof sign" at this

24  location under an "exception" to the Original Hollywood SUD's take-

25  down requirement "such that less signage would have to be taken down

26  than required by the code" and the owner was not required to pay an

27  "in lieu" fee.  Paramount claims that an "open panel roof sign" is "in

28  all relevant respects a 'supergraphic'" and that is why it undermined

the City's interests.  This is incorrect.  An "open panel roof sign" is defined as "[a] type of roof sign consisting of Channel Letters, graphic segments, open lighting elements, or another open form which combines solid segments and transparent spaces." (City's Nov. 17, 2010 RJN, Ex. 13 at 267.)  A "supergraphic" sign, by contrast, is "[a] sign, consisting of an image which is applied to and made integral with a wall, or projected onto a wall or printed on vinyl, mesh or other material," and which must be at least 1200 square feet in size. (Id. at 268, 282 § 5M.)

The City could readily conclude that massive mesh or vinyl supergraphic signs implicate different safety and aesthetic concerns than open-panel roof signs, so prohibiting the former while permitting the latter does not undermine its interest in regulating either one. Paramount's signs also were not considered "open panel roof signs" and Paramount may not challenge a provision that was never applied to it. Get Outdoors II, LLC v. City of San Diego, 506 F.3d 886, 892 (9th Cir. 2007).  And finally, even if Paramount were correct that its supergraphic signs and "open panel roof signs" were similar, Paramount alleged that at least some signage was taken down in order for the owner to erect this sign, which again advances the City's interests. This does not demonstrate a "exception" sufficient to state a Central Hudson claim.

### 939 S. Figueroa St., 6253 Hollywood Blvd., & 115 W. Washington Blvd.

Paramount alleges that CBS Outdoor was granted "vested" permits at these three locations as part of a state-court settlement.  The Court has taken judicial notice of the settlement agreement and judgment filed in state court, which demonstrates that the signs

1   deemed "vested" were painted wall signs erected before the City's 2002

2   ban on supergraphic and off-site signs, not supergraphic signs like

3   Paramount's.  (City's Feb. 28, 2011 Supp. RJN, Ex. 10 at 130.)

4   Paramount's only response is that the judgment was "clearly collusive"

5   (Opp'n 10), but it offers no explanation for this conclusory

6   allegation.  These allegations do not demonstrate an "exception"

7   sufficient for a <u>Central Hudson</u> underinclusivity claim.

8   **1800 Highland Ave.**

9   Paramount alleges that the property owners at this location were

10   permitted to "skirt the take-down requirements" and were exempted from

11   limitations on having two signs on the same side of the property.  The

12   City offers documents to show that existing billboards and wall signs

13   were required to be taken down, but these documents are not subject to

14   judicial notice and the Court cannot consider them.  Nevertheless,

15   Paramount admits that "some number of signs did come down."  (Opp'n

16   10.)  The removal of this signage advanced the City's interests under

17   the Original Hollywood SUD.

18   Paramount also complains that the owners at this site were

19   allowed to erect two signs on one side of a building, when only one

20   should have been allowed.  The City explains that the facade of this

21   building is split, such that a single sign would be split in two to be

22   erected there.  (City's March 21, 2011 Supp. RJN, Ex. 16.)  Paramount

23   did not seek any sort of exception like this and this minor exception

24   compelled by the building's architecture does not undermine the City's

25   interests.

26       3.   <u>Conclusion</u>

27   Paramount has failed to plead that the alleged "exceptions" to

28   the Original Sign Ordinance undermined the City's interests in

aesthetics and improving the visual environment and, as a result, has
not alleged that the Original Hollywood SUD was "'so pierced by
exceptions and inconsistencies' as to be unconstitutionally
underinclusive." World Wide Rush, 606 F.3d at 686.  Although
Paramount alleges more generally that the City's interests are
undermined by the "large number of supergraphics, digital signs, roof
top signs, billboards and other signs in the Hollywood SUD" (SAC ¶
62(1)(c)), if Paramount cannot state a Central Hudson underinclusivity
claim with the specific locations identified above, then it also
cannot do so with its vague allegations that other signs exist.  See
Metro Lights, 551 F.3d at 910—11.  Thus, Paramount has failed to state
a plausible Central Hudson underinclusivity claim against the Original
Hollywood SUD and its first claim is DISMISSED WITH PREJUDICE.

     **B.**   **Claim 2: As-Applied Central Hudson Challenge to the Sign
Regulations**

This claim repeats allegations similar to those supporting
Paramount's Central Hudson challenge to the Original Hollywood SUD,
but Paramount supports this claim by pointing to only two "exceptions"
to the City's general ban on supergraphic signs: the downtown "L.A.
Live" complex and the downtown Marriott/Ritz Carlton hotel/condominium
property.  Paramount claims only that supergraphic signs were erected
at those locations, but does not explain how they undermine the City's
interests.  Even so, the existence of two exceptions do not undermine
the City's interests.  See World Wide Rush, 606 F.3d at 685.  Further,
those properties are located within another SUD and the City is
permitted to create different sign SUDs for different locations in the
City and allow owners to erect signs in them.  See Vanguard, 2011 WL

2175891, at *7; <u>World Wide Rush</u>, 606 F.3d at 688. The Court therefore DISMISSES this claim WITH PREJUDICE.

**C. Claim 3: As-Applied Central Hudson Challenge to the Amended Hollywood SUD**

Effective November 17, 2010, the Amended Hollywood SUD bans all supergraphic signs in the Hollywood SUD except for projects with vested rights under California law and "grandfathered" projects approved on or before November 12, 2008 (the date of the first public hearing on the Amended Hollywood SUD). (SAC ¶ 36; City's Nov. 17, 2010 RJN, Ex. 9 at 197—98, § 6K.) Paramount's third claim is an as-applied <u>Central Hudson</u> challenge to the Amended Hollywood SUD based on many of the same "exceptions" discussed with relation to the Original Hollywood SUD, but which were allegedly permitted or erected after the November 17, 2010 effective date of the Hollywood SUD (e.g., 6200 Hollywood Blvd., 5825 W. Sunset Blvd., 6725 Sunset Blvd., and 1800 N. Highland Ave.). Paramount also claims that the City will allow 15 additional supergraphic signs pursuant to the "grandfathered" provision in the Amended Hollywood SUD.

Paramount has made clear that this claim is based on the theory that the Amended Hollywood SUD "perpetuate[s] the very discretionary exceptions and variances granted under the Original Hollywood SUD" (Opp'n 18) because the City has used (and will use) the "grandfathered" and "vesting" exceptions to allow certain signs. However, because the Court has found that none of the cited exceptions undermines the City's interests sufficiently to implicate a <u>Central Hudson</u> challenge, there is nothing to "perpetuate" and there is no constitutional infirmity based on any signs alleged to have been permitted under the Amended Hollywood SUD. Moreover, these claims

1  appear to be facial challenges because the City has never applied the

2  Amended Hollywood SUD to Paramount, and the Court has already

3  dismissed with prejudice all facial challenges to the Amended

4  Hollywood SUD.  (Docket No. 67 at 22—23.)  Thus, the Court DISMISSES

5  this claim WITH PREJUDICE.

6      **D.**    **Claims 4 and 5: "As-Applied" "Unbridled Discretion"**

7            **Challenges to the Original and Amended Hollywood SUDs**

8      Paramount attempts to advance "as-applied" claims against the

9  Original and Amended Hollywood SUDs on the grounds that they grant

10  officials "unbridled discretion" to grant permit applications without

11  objective and definite standards.

12          1.    Amended Hollywood SUD

13      Paramount's challenge to the Amended Hollywood SUD fails because

14  the "grandfathered" and "vesting" provisions are based on definite

15  objective standards.  The Amended Hollywood SUD allows supergraphic

16  signs from projects that have vested rights under California law and

17  projects that were approved on or before November 12, 2008 (the date

18  of the first public hearing on the Amended Hollywood SUD).  The Court

19  already concluded that the "vesting" exception is not vague.  (Docket

20  No. 67 at 22.)  In any case, there is no discretion to be exercised

21  under these specific, definite criteria: either a proposed

22  supergraphic sign complies with these provisions or it does not.  This

23  claim therefore must be DISMISSED WITH PREJUDICE.

24          2.    Original Hollywood SUD

25      Paramount's unfettered discretion challenge to the sign reduction

26  and "in lieu" fee requirements under the Original Hollywood SUD was

27  the focus of the parties' additional briefing after the Paramount I

28  appeal was dismissed.  As the Court previously ruled, Paramount may

only seek damages for any violation of its rights caused by the

Original Hollywood SUD.  Given this limitation, the parties dispute

whether an "as-applied" "unbridled discretion" claim exists, or

whether this type of claim must always be considered a facial

challenge, and whether damages can be recovered as a legal matter for

a facial "unbridled discretion" claim.[9]  The parties also raise

various other arguments related to the preclusive effect of the

decision in Paramount I on Paramount's damages claims here.  The Court

need not address any of these contentions because Paramount is unable

to plausibly allege that the damages it incurred were the result of

any unfettered discretion created by the Original Hollywood SUD,

---

[9]As a general matter, there are two types of facial free speech challenges.  Foti v. City of Menlo Park, 146 F.3d 629, 635 (9th Cir. 1998).  "In the first type of facial challenge, the plaintiff argues that the ordinance could never be applied in a valid manner because it is unconstitutionally vague or it impermissibly restricts a protected activity."  Id.  "The second type of facial challenge is an exception to our general standing requirements: the plaintiff argues that the statute is written so broadly that it may inhibit the constitutionally protected speech of third parties, even if [the plaintiff's] own speech may be prohibited."  Id.  If either challenge is successful, the law is rendered invalid in all applications. Id.  An as-applied challenge "contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others."  Id.  Therefore, "[a]n as-applied challenge does not implicate the enforcement of the law against third parties.  Rather, a litigant may separately argue that discriminatory enforcement of a speech restriction amounts to viewpoint discrimination in violation of the First Amendment."  Id.  A plaintiff may point to a pattern of discriminatory enforcement to support an as-applied challenge.  See, e.g., Long Beach Area Peace Network v. City of Long Beach, 574 F.3d 1011, 1029 (9th Cir. 2009) (suggesting that an as-applied claim against a statute may lie "if, in its implementation, there emerged 'a pattern of unlawful favoritism.'" (quoting Thomas v. Chicago Park Dist., 534 U.S. 316, 324—25 (2002)); see also S. Or. Barter Fair v. Jackson Cty., 372 F.3d 1128, 1140 (9th Cir. 2004); G.K. Ltd. Travel v. City of Oswego, 436 F.3d 1064, 1084 (9th Cir. 2002).  A successful as-applied challenge renders only the particular application of the law invalid, not the entire law itself.  Foti, 146 F.3d at 635.

rather than a May 2010 state-court enforcement proceeding involving later bans applied to Paramount's supergraphic signs.  Without plausible allegations of damages caused by the Original Hollywood SUD, Paramount's claims fail.

To state a 42 U.S.C. § 1983 claim for damages, a plaintiff must allege that the defendant's conduct was the actionable cause of its injuries, which includes allegations of both causation-in-fact and proximate causation.  See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 216 F.3d 764, 783 (9th Cir. 2000), aff'd 535 U.S. 302 (2002).  A claim fails when there are "intervening causes that break the chain of proximate causation."  Van Ort v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir. 1996).

Paramount alleges that its permit applications for permanent supergraphic signs were rejected under the Original Hollywood SUD in August 2006 and again in June 2008.  (SAC ¶¶ 23—26.)  However, Paramount has repeatedly admitted that it continued to maintain its signs — and thus lost no revenue — up until May 2010, when it finally took those signs down in the face of threatened criminal and civil action in state court under the general Sign Ordinance's ban on new supergraphic signs, not the Original Hollywood SUD, which was not in effect at that time.  For example, in opposing the motion to dismiss the appeal in Paramount I, Paramount's President Bradley Folb attested that "the City began rigorously enforcing, both civilly and criminally, its supergraphics 'bans'" through "a state court civil enforcement lawsuit filed against Paramount on May 4, 2010, seeking $5,000 per day for each sign displayed.  As a result of the City's aggressive enforcement efforts, Paramount was forced to remove its signs and is no longer earning any advertising revenue."  (City's June

30, 2011 RJN, Ex. E ¶ 5.)   In support of the supplemental briefing here, Folb repeated this statement that Paramount incurred no damages until the City undertook these enforcement efforts in May 2010.  (Folb Decl. ¶ 5.)

Moreover, in the current supplemental briefing, Paramount argued that its waiver of damages in Paramount I should not preclude damages in this case because, at the time of the judgment in Paramount I, "Paramount had not yet suffered any damages, and therefore could not identify them in response to the City's interrogatories." (Pl. Supp. Reply Br. 15.)  Paramount further wondered:

> How could Paramount have even legitimately continued to pursue a damages claim in Paramount I if it had not suffered any monetarily compensable injury?  What was Paramount to do other than agree that it was not seeking a remedy that it was not entitled to at the time?  The fact that it chose not to pursue a claim it did not have cannot be bootstrapped into a perpetual future waiver — especially now that there is a new case, based on new damages, and after an unanticipated subsequent change in the law three years later.

(Id.)

Even the Ninth Circuit in its memorandum disposition dismissing the Paramount I appeal suggested that there was a lack of damages resulting from the Original Hollywood SUD: "Paramount is not able to demonstrate that any alleged damages it incurred after the district court's order resulted from application of the provisions of the Hollywood SUD challenged in the complaint.  Moreover, the City confirmed at oral argument that its post-judgment enforcement actions are based on the versions of the Los Angeles Municipal Code §§ 14.4.4(B)(9) and 14.4.4(B)(11) amended as of August 14, 2009, and that [it] has not, and will not, seek damages on the basis of the provisions eliminated as a result of the September 2010 amendment."

1   (Paramount's June 17, 2011 RJN, Ex. I at 2.)   These admissions

2   demonstrate that May 2010 enforcement action broke the chain of

3   causation between the Original Hollywood SUD and Paramount's damages.

4        To avoid dismissal, Paramount argues that the Original Hollywood

5   SUD was at least one cause of its damages because, without the permits

6   that were allegedly unlawfully denied, it could have erected signs and

7   would not have been subject to the state-court enforcement action.

8   Even assuming this might allege causation-in-fact, no reasonable

9   observer could conclude that Paramount's damages beginning in May 2010

10  in the face of the state-court enforcement action involving a newly

11  enacted sign ban are proximately caused by the denial of permits years

12  earlier under the Original Hollywood SUD.   Because Paramount cannot

13  allege that any damages resulted from any alleged unfettered

14  discretion embodied in the Original Hollywood SUD, this claim must be

15  DISMISSED WITH PREJUDICE.

16       **E.   Claim 6: As-Applied First Amendment Challenge to the**

17            **Original and Amended SUDs for Favoring Large Companies**

18       Paramount alleges that the sign reduction requirement in the

19  Original Hollywood SUD and the "grandfathered" and "vesting"

20  exceptions in the Amended Hollywood SUD operate to favor large

21  companies who own billboard structures and could afford to take down

22  some signs under the sign removal program or purchase "take-down

23  rights" from other entities, which resulted in viewpoint

24  discrimination against speakers who could not afford to participate in

25  the program.   This does not state a First Amendment claim.   The City

26  was permitted to exercise discretion in creating a sign reduction

27  program to ameliorate blight in the Original Hollywood SUD, so it

28  could validly condition the erection of supergraphic signs on reducing

other signage and/or paying a fee to that would achieve a similar purpose.  See World Wide Rush, 606 F.3d at 686.  Paramount fails to demonstrate how this scheme amounts to viewpoint discrimination, when there is no suggestion that the City reviews the content of any proposed supergraphic sign in determining whether to permit it.

Paramount also suggests that the Original and Amended Hollywood SUDs are invalid because they did not leave open ample alternative avenues for speech for small companies like Paramount.  However, a regulation is invalid on this ground only if it forecloses "'an entire medium of public expression across the landscape of a particular community or setting.'"  G.K. Ltd. Travel, 436 F.3d at 1074.  The restrictions in the Original Hollywood SUD at issue here did not prohibit an "entire medium" of public expression because it was limited to supergraphic signs and did not even ban all of those; it only prohibited some commercial supergraphic signs for certain companies that were unable or unwilling to comply with the sign reduction or "in lieu" fee requirements.  This did not foreclose Paramount (or its advertising clients) from taking advantage of the medium of supergraphic signs to disseminate any messages with another company approved to erect supergraphic signs at permitted locations.  Even the Amended Hollywood SUD, which banned all new commercial supergraphic signs, did not overly restrict avenues for speech because even a blanket ban on one type of commercial sign does not foreclose so many avenues of commercial speech that it renders the ban invalid.  See id. (finding prohibition of "pole" signs left open ample alternative avenues for non-sign-based forms of communication, "such as handbills, radio, television, newspaper, or telemarketing.").  Thus, these allegations fail to state a First Amendment violation and

1  must be DISMISSED WITH PREJUDICE.

2  **F.   Claim 7: As-Applied First Amendment Challenge to the**

3  **Original SUD for Varying Fees for Speakers**

4      Paramount styles this claim as an "as-applied" challenge to the

5  Original Hollywood SUD because the "in lieu" fee required to erect

6  supergraphic signs was an "illegal charge for, and tax on, speech"

7  that carried no standards to fix the amount of fees.  To the extent

8  this actually pleads a facial claim that the Original Hollywood SUD

9  lacked standards to cabin officials' discretion to charge

10  discriminatory fees, it fails for the same reasons as Paramount's

11  unbridled discretion claims failed.

12      To the extent this pleads an as-applied challenge that Paramount

13  was charged a fee in order to speak, it does not state a claim.  The

14  court in Metro Lights rejected a similar contention that the City had

15  impermissibly "'auction[ed] off First Amendment rights' to the highest

16  bidder" for the contract to erect signs at transit stops throughout

17  the City.  See 551 F.3d at 912.  The court reasoned that this was just

18  a "repackaged" Central Hudson underinclusivity argument that did not

19  result in a situation in which the government had "silence[d] one

20  speaker but not another because the latter has paid a tax, even though

21  it could constitutionally silence both."  Id. at 913—14.  That was

22  because, unlike a tax on speech that would transform an otherwise

23  permissible restriction on speech into merely a revenue-generating

24  scheme, the contract to a single company over the City's street

25  furniture actually furthered the City's interests in traffic safety

26  and aesthetics by giving it control over a single company who posts

27  signs at transit stops.  Id.

28      The provisions of the Original Hollywood SUD present as strong a

case as Metro Lights to reject the "unconstitutional fee" argument. As in Metro Lights, the City's interests here were directly furthered through the sign reduction and "in lieu" fee provisions in the Original Hollywood SUD because both requirements helped improve aesthetics and reduce other signage. As a result, any fees charged for erecting supergraphic signs did not transform this otherwise legitimate sign regulation into an impermissible revenue-generating scheme. Moreover, a sign company could avoid paying fees entirely under the Original Hollywood SUD so long as the company reduced other signage, which directly advanced the City's interests in aesthetics without implicating the issue of unconstitutional fees. Consistent with Metro Lights, then, Paramount's claim fails on this basis and must be DISMISSED WITH PREJUDICE.

> **G.    Claim 8: As-Applied First Amendment Challenge that the City Improperly Refused Paramount's Permit Requests and Influenced the CRA to Do the Same**

Paramount claims in essence that the City's Planning Department, the Department of Building Safety, and the Fire Department refused to process its permit applications and improperly influenced the CRA to likewise refuse Paramount's permit applications.[10] Paramount fails to explain how these allegations amount to a First Amendment violation because it has not alleged that any City official discriminated based on the content or viewpoint of Paramount's proposed supergraphic signs or even that City officials were aware of the content of the proposed signs. See Long Beach Area Peace Network, 574 F.3d at 1020. Thus,

---

[10]This challenge must be directed at only the Original Hollywood SUD because Paramount does not allege that it applied for permits under the Amended Hollywood SUD. (SAC ¶ 35—36.)

1   for this as-applied challenge, Paramount has failed to allege that

2   "discriminatory enforcement of a speech restriction amounts to

3   viewpoint discrimination in violation of the First Amendment."   <u>Foti</u>,

4   146 F.3d at 635.

5        Moreover, it is clear that the inability of Paramount to obtain

6   permits for its supergraphic signs in the Hollywood SUD stemmed from

7   its refusal to comply with the sign reduction program or enter an

8   agreement with the CRA for "in lieu" fees, not unexplained improper

9   actions or influence of City officials.   For example, in support of

10  its claims in the FAC and in opposition to the City's motion to

11  dismiss the FAC, Paramount cited a declaration filed in the Ninth

12  Circuit in <u>Paramount I</u> from Pamela K. Anderson, a consultant for

13  Paramount during the permitting process.   In that declaration, Ms.

14  Anderson testified under penalty of perjury that Paramount's permit

15  requests were rejected in 2006 because they "did not have a

16  (billboard) 'trade-in' component" and Paramount was "unable to secure

17  an acceptable 'in lieu fee' agreement" with the CRA for permanent

18  supergraphic permits.   (Paramount's Jan. 14, 2011 RJN, Ex. F at

19  133—34, ¶ 11.)   Likewise, Paramount cited a declaration filed in the

20  Ninth Circuit in <u>Paramount I</u> from Luis F. Magdaleno, another

21  consultant, who testified under oath that he was rebuffed by the City

22  in 2008 because Paramount had not obtained sign reduction credits from

23  the CRA that would have allowed Paramount's proposed supergraphic

24  signs; indeed, the City permitting official told him that "there was

25  no point in attempting to submit a Land Use Permit Application because

26  it would not be accepted without first having the signage removal

27  credits in place" and that he should work with the CRA to obtain those

28

credits.  (Paramount's Jan. 14, 2011 RJN, Ex. F at 191—92, ¶¶ 5—6.)[11]
Thus, according to Paramount's own consultants, the City refused to
grant permit applications because Paramount did not comply with the
terms of the Original Hollywood SUD, not because any City officials
simply "refused" to process permit applications.

Paramount further suggests that personnel in the City Attorney's
office improperly influenced City officials and the CRA to deny
Paramount's permit applications, while encouraging approval of others.
This theory fails because the City Attorney certainly may advise City
Departments and officials without violating the First Amendment.
(City's Feb. 28, 2011 Supp. RJN, Ex. 13, § 271(b).)  Indeed,
recognizing this theory of liability would significantly chill the
City Attorney's ability to provide candid legal advice.

Finally, the Court rejects Paramount's conclusory suggestion that
the City "allowed" the CRA to improperly deny Paramount's permit
requests because Paramount has not come close to pleading facts to
support a policy or custom that could impose direct liability on the
City.  Monell v. Dept. of Soc. Servs., 436 U.S. 658, 694 (1978).  Nor
is such a theory legally tenable since the CRA is considered a
distinct entity from the City under California law.  See Pac. States
Enters., Inc. v. City of Coachella, 13 Cal. App. 4th 1414, 1424 (1993)

---

[11]The Court previously declined to judicially notice the contents
of the Magdelano declaration when Paramount offered the declaration to
defeat dismissal of the CRA in this case.  (Docket No. 62 at 9 n.3.)
Now offered by the City, the contents of the Anderson and Magdelano
declarations are now undisputed and can be judicially noticed.  See
Ritchie, 342 F.3d at 908—09; Branch v. Tunnell, 14 F.3d 449, 453—54
(9th Cir. 1994).  Indeed, Paramount does not object to the
consideration of these documents or argue that it would be permitted
to allege facts in the SAC in conflict with these sworn statements.
In any case, these documents simply provide more detail surrounding
the alleged permit denials in 2008 and 2010.  (See SAC ¶¶ 26, 32.)

1  ("Redevelopment agencies are governmental entities which exist by

2  virtue of state law and are separate and distinct from the communities

3  in which they exist.").  Thus, Paramount has failed to state a First

4  Amendment claim on this basis and this claim is DISMISSED WITH

5  PREJUDICE.

6      **H.**   **Claim 9: Facial and As-Applied Challenges to the City's Sign**

7         **Regulations under the California Constitution**

8       Paramount alleges that the California Constitution imposes

9  stricter requirements for regulating commercial speech than the First

10 Amendment, and it claims that the City's Sign Regulations

11 independently violate the California Constitution.  The Ninth Circuit

12 rejected this same contention in <u>Vanguard</u>, 2011 WL 2175891, at *10.

13 Because the California Constitution's protection of commercial speech

14 is coextensive with the protection under the First Amendment,

15 Paramount's state constitutional claims fail for the same reasons and

16 must be DISMISSED WITH PREJUDICE.

17     **I.**   **Claim 10: Declaration of Vested Rights**

18      Paramount alleges that it is entitled to a declaration that it

19 either has vested rights to supergraphic sign permits at the Sunset

20 Properties or that such permits should be considered "grandfathered"

21 under the Amended Hollywood SUD because its permit applications were

22 unlawfully denied.  Not only does this contention fail because

23 Paramount has not pled a claim that its permits were wrongfully

24 denied, but the Ninth Circuit also rejected this very argument in

25 <u>Outdoor Media</u> when it held that "wrongfully denied" permits do not

26 give rise to vested rights under California law.  506 F.3d at 903.

27 Thus, this claim must be DISMISSED WITH PREJUDICE.

28

### J.  **Equal Protection Claims**

Paramount alleges that the same facts already addressed above also form the basis for an equal protection violation because the City discriminated against it by denying its permit applications while granting the applications of other, similarly situated speakers. Paramount has not alleged that the City discriminated based on the content or viewpoint of any speech or based on a protected characteristic.  As was the case with the sign company in Vanguard, then, "[b]ecause Plaintiff is not a member of a suspect class, its equal protection claim is subject to rational basis review unless its fundamental right of free speech is implicated."  2011 WL 2175891, at *7.

Paramount's equal protection claim fails for reasons similar to those that caused its Central Hudson claims to fail.  As outlined above, the City's interests were directly advanced by implementing the sign reduction program in the Original Hollywood SUD.  The sign companies that were granted permission to erect signs in the Hollywood SUD were allowed to do so because they complied with the sign reduction and "in lieu" fee requirements.  When Paramount could not or would not comply with this program for its new supergraphic signs, it was no longer similarly situated to other sign companies that could comply and the City could reasonably preclude its signs while allowing others.  And even if Paramount could be considered similarly situated to those other companies that could reduce signage or pay the "in lieu" fees, the City could have reasonably preferred those other companies over Paramount in order to further its interests in the Hollywood SUD.

To the extent Paramount is complaining that it had to pay higher

45

fees or comply with more onerous requirements than other companies,
the CRA, and <u>not</u> the City, set the fees and other requirements for
Paramount under the Original Hollywood SUD and the sign reduction
program.  (SAC ¶¶ 22—23.)  As explained above, Paramount has failed to
demonstrate that the City can be held liable for the acts of the CRA
pursuant to <u>Monell</u> or that the CRA should not be considered a separate
entity under state law.  <u>See</u> <u>Pac. States</u>, 13 Cal. App. 4th at 1424.

Paramount cites <u>Valley Outdoor, Inc. v. City of Riverside</u>, 446
F.3d 948, 955 (9th Cir. 2006), but that case does not preserve
Paramount's equal protection claims here.  In that case, the court
analyzed a "class of one" equal protection theory[12] and allowed a
billboard company to present evidence that the city had "arbitrarily,
maliciously, and dishonestly den[ied]" its permit applications in
retaliation for the company's filing of a permit application during a
period of time when the city was legally powerless to prevent erection
of the signs requested.  <u>Id.</u>  Here, in contrast, Paramount is not
pleading a "class of one" equal protection claim; it has not alleged
that the City harbored animosity toward it that fueled the denials of
its permit applications.  Instead, it points to the allegedly
differing treatment of similarly situated sign owners that received
approvals for "indistinguishable signage." (SAC ¶ 71.)  This is a
traditional equal protection claim and Paramount has not pled a
violation.  Thus, it is DISMISSED WITH PREJUDICE.

---

[12]<u>See</u> <u>Vill. of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000).

**K.    As-Applied Takings Claims**[13]

The Court previously dismissed Paramount's takings claims with leave to amend to address the deficiencies identified by the Court. While Paramount has attempted to replead its as-applied claim, it still fails for the same reasons it failed before.

This claim is based upon two cases from the Supreme Court recognizing a regulatory takings claim where exactions required by permit conditions lacked a reasonable relationship to the government's asserted interest in requiring the condition. See Dolan v. City of Tigard, 512 U.S. 374, 388—89 (1994); Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 837 (1987). An as-applied Dolan/Nollan claim is subject to the ripeness requirements from Williamson County Regional Planning Commission v. Hamilton Bank of Johnson County, 473 U.S. 172, 195 (1985), which require that the plaintiff (1) obtain a final administrative decision applying the regulation to the property at issue and (2) seek compensation through state procedures. Guggenheim v. City of Goleta, 638 F.3d 1111, 1117 (9th Cir. 2010) (en banc), cert. denied 131 S. Ct. 2455 (2011).

A "final decision" exists when "(1) a decision has been made 'about how a plaintiff's own land may be used' and (2) the local land-use board has exercised its judgment regarding a particular use of a specific parcel of land, eliminating the possibility that it may 'soften[] the strictures of the general regulations [it] administer[s].'" Adam Bros. Farming, Inc. v. Cty. of Santa Barbara, 604 F.3d 1142, 1147 (9th Cir. 2010) (brackets in original; citation

---

[13]Although Paramount pled claims under both the federal and California constitutions in the SAC, in the meet-and-confer process, Paramount abandoned the California claim and the Court does not address it.  (City's Feb. 28, 2011 Supp. RJN, Ex. 14.)

1  omitted).  A final decision is required because "only a regulation
2  that goes too far results in a taking under the Fifth Amendment" and
3  "a court cannot determine whether a regulation has gone 'too far'
4  unless it knows how far the regulation goes."  Id. (internal quotation
5  marks omitted).

6      The second Williamson requirement is satisfied when the plaintiff
7  brings a claim in state court, requesting just compensation for the
8  alleged taking.  Id.  "This requirement exists because the 'Fifth
9  Amendment does not proscribe the taking of property; it proscribes
10 taking without just compensation,'" and "[i]t is not until a party
11 seeks and is denied just compensation from the state that a
12 constitutional violation occurs."  Id.  In California, that requires a
13 plaintiff bringing an as-applied regulatory takings claim based on
14 land-use conditions to file a petition for a writ of mandamus in state
15 court to determine whether the conditions are permissible, which gives
16 the municipality the opportunity to withdraw those conditions if found
17 to be invalid to avoid compensating the plaintiff.  See Hensler v.
18 City of Glendale, 8 Cal. 4th 1, 14 (1994).  Thus, "[a] California
19 landowner, who believes that application of a state statute or local
20 ordinance limiting development of the owner's property works a taking,
21 may not bypass the remedies the state has made available to avoid the
22 taking."  Id. at 19.

23     Paramount has once again only alleged an unripe takings claim.
24 First, Paramount has not alleged that it obtained a final
25 determination of the conditions for a supergraphic sign permit from
26 the CRA when it sought one in 2006.  Paramount simply alleges that it
27 "approached" the CRA in 2006 about erecting supergraphic signs and was
28 given certain conditions by the CRA for the granting of those permits.

There is no suggestion that this was in any way the CRA's final offer
of conditions or that Paramount sought to have any of these conditions
altered through any formal procedure.  Second, Paramount does not
allege that it ever sought any sort of compensation for the conditions
imposed by the CRA through state court.

While Paramount claims without explanation that it satisfies the
Williamson ripeness requirements (Opp'n 24), the crux of its argument
is that the Court should simply ignore the ripeness requirements for
this claim because these requirements are prudential.  See Guggenheim,
638 F.3d at 1117—18 (assuming without deciding that claim was ripe
because ripeness considerations were prudential); see also Adam Bros.,
604 F.3d at 1148 (same).

Paramount alleges three reasons why ripeness should be ignored
here: "(1) because of the long and complex history of this case and
current posture of the various litigations between the parties, it
would be extremely inefficient and wasteful of the parties' and the
Court's resources to 'bounce the case through more rounds of
litigation,' [citing Guggenheim, 638 F.3d at 1118]; (2) the facts
relevant to this claim are inextricably intertwined with the facts
relevant to Plaintiffs' other claims and should therefore be tried in
conjunction with each other; [and] (3) the facts relevant to this
claim are settled and well-defined and this claim is, therefore, fully
ripe and ready for adjudication by this Court."  (SAC ¶ 85.)  The
Court is not satisfied that these considerations counsel in favor of
waiving ripeness requirements here.

Paramount's first contention rings hollow because it was the one
that filed two successive federal lawsuits over the same two locations
for supergraphic signs, which created the "long and complex" history

between the parties.  Moreover, Paramount did not even assert a
takings claim until it filed the FAC in October 2010, more than two
years after the case was originally filed, so it cannot claim that the
long history of this litigation provides a ground to ignore the
ripeness of a claim it has only recently alleged.  And the Court can
identify nothing "wasteful" about requiring Paramount to seek
compensation in state court before returning to this Court, given that
the Court has dismissed the rest of its claims with prejudice and a
state-court decision could relieve this Court of the need to spend
further scarce judicial time and resources on Paramount's claims.

Paramount's second contention is likewise unpersuasive because,
again, nothing remains of this case, so even if the facts are
intertwined, they will not be "tried in conjunction with each other,"
as Paramount alleges.

Finally, Paramount's third contention lacks merit because the
facts relevant to its takings claim are not settled or well-defined.
A <u>Dolan/Nollan</u> takings claim arises only in cases involving
"adjudicative, individual determinations conditioning permit approval
on the grant of property rights to the public." <u>McClung v. City of
Sumner</u>, 548 F.3d 1219, 1227 (9th Cir. 2008).  Paramount alleges that
only some of the conditions imposed by the CRA "presumably" served
public purposes, such as dedicating a level of parking and
constructing an additional level of parking at the Sunset Properties.
(SAC ¶¶ 82.)  Had Paramount progressed further in negotiations with
the CRA, these or other conditions might have been eliminated and, if
not, Paramount could have filed a petition for a writ of mandamus in
state court to determine whether the conditions were permissible,
which would have given the CRA the opportunity to withdraw those

50

1    conditions.  See Hensler, 8 Cal. 4th at 14.  Thus, the Court finds

2    that these claims are unripe and must be dismissed.[14]

3                              **CONCLUSION**

4         For the reasons discussed above, all of Paramount's claims fail

5    and this case must be DISMISSED in its entirety.[15]  Although Paramount

6    requests leave to amend the SAC, many of Paramount's claims are

7    legally deficient, rendering any amendment futile, and Paramount has

8    already had several chances to amend.  Therefore, the SAC must be

9    dismissed WITH PREJUDICE.  See City of Los Angeles v. San Pedro Boat

10   Works, 635 F.3d 440, 454 (9th Cir. 2011); see also Cafasso v. Gen.

11   Dynamics C4 Sys., 637 F.3d 1047, 1058 (9th Cir. 2011) (noting that the

12   "'district court's discretion to deny leave to amend is particularly

13   broad where plaintiff has previously amended the complaint.'").[16]

14        The City is ORDERED to lodge a proposed judgment dismissing this

15   case **within 10 days of the date of this Order.**

16        **IT IS SO ORDERED.**

17        **DATED: August 2, 2011**        _____

18                              **AUDREY B. COLLINS**
                               **CHIEF UNITED STATES DISTRICT JUDGE**
19

20        [14]Even assuming the takings claim is ripe as Paramount urges, it
     fails because the CRA imposed the challenged permit conditions, not
21   the City, and the City cannot be held liable for the CRA's actions.
     See Pac. States, 13 Cal. App. 4th at 1424 (1993); see also Oceanside
22   Marina Towers Ass'n v. Oceanside Cmty. Redev. Comm'n, 187 Cal. App. 3d
     735, 741 (1986); Nolan v. Redev. Agency of City of Burbank, 117 Cal.
23   App. 3d 494, 499—501 (1981).  Thus, this claim must be DISMISSED WITH
     PREJUDICE.
24

25        [15]The parties agree that Paramount's 42 U.S.C. § 1983 claim is
     merely pled as a vehicle to assert constitutional claims for damages
26   and injunctive relief.  Thus, it fails as well.

27        [16]In its supplemental briefs, Paramount requested that the Court
     stay this case because there is a possibility of en banc or Supreme
28   Court review in Paramount I and Vanguard.  That request is DENIED.